**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| XIAOHU WANG, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VITAL FARMS, INC., RUSSELL DIEZ-CANSECO, and THILO WREDE,<br><br>Defendants. | **Case No: 1:26-cv-00738-RP**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Xiaohu Wang and named plaintiff Samuel Wombough ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Vital Farms, Inc. ("Vital Farms" or the "Company"), media reports, regulatory documents, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Vital Farms securities between May 8, 2025 and February 26, 2026, inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by

Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

**JURISDICTION AND VENUE**

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6. Lead Plaintiff Xiaohu Wang purchased Vital Farms securities during the Class Period and was economically damaged thereby. His PSLRA certification was previously filed with the Court and is incorporated by reference herein.

7. Named plaintiff Samuel Wombough purchased Vital Farms securities during the Class Period and was economically damaged thereby. His PSLRA certification is attached as Exhibit 1 hereto.

8. Defendant Vital Farms purports to be an ethically minded food company that became the leading U.S. brand of pasture-raised eggs and second-largest U.S. egg brand by retail dollar sales. Defendant Vital Farms is incorporated in Delaware. Its headquarters are located at 3601 South Congress Avenue, Suite C100, Austin, TX 78704. Vital Farms securities trade on The Nasdaq Stock Market LLC (the "NASDAQ") under the ticker symbol "VITL."

9. Defendant Russell Diez-Canseco ("Diez-Canseco") served as the Company's Chief Executive Officer ("CEO") and President at all relevant times. Prior to joining Vital Farms in 2014, Diez-Canseco spent several years with McKinsey & Company, H-E-B Grocery, and the Central Intelligence Agency.

10. Defendant Thilo Wrede ("Wrede") has served as the Company's Chief Financial Officer ("CFO") since March 2023. Wrede leads the Company's accounting, treasury, financial planning and analysis, information technology, and investor relations functions. Wrede previously served as Global Chief Financial Officer at Sabra Dipping Company, LLC. Sabra is the leading U.S. brand of hummus and other fresh dips and spreads. Prior to that, he was CFO for PepsiCo's Central and South America Foods division. Wrede has extensive experience on Wall Street, where he was an equity research analyst at both Credit Suisse and Jefferies & Company.

11. Defendants Diez-Canseco and Wrede are collectively referred to herein as the "Individual Defendants."

12. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

13. Vital Farms is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Vital Farms under *respondeat superior* and agency principles.

15. Vital Farms and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

16. Vital Farms is the leading U.S. brand of pasture-raised eggs and butter, purportedly focusing on ethical food production, animal welfare, and sustainable farming. The Company operates a distributed supply chain comprised of more than 600 small family farms, which serve as the foundation of its production model. The Company represents that this decentralized sourcing

approach enhances supply chain resilience and supports consistent product quality.

17. The Company's egg and butter products are sold at The Kroger Co., Sprouts Farmers Market, Target Corporation, Whole Foods, Albertsons Companies, Inc., Publix Super Markets, Inc. and Walmart, Inc.

18. The Company uses third-party freight carriers to collect eggs from farmers and place them in cold storage to pack them for shipping at the Company's shell egg processing facility, Egg Central Station ("ECS").

19. On March 7, 2024, Vital Farms filed its annual report on a Form 10-K for the fiscal year ended December 31, 2023 ("2023 10-K"). In the 2023 10-K, Vital Farms included the following risk disclosure regarding the implementation of its enterprise resource planning ("ERP") system:

> We are in the process of transitioning to a new enterprise resource planning, or ERP, system, in order to support our future growth and more fully optimize our existing processes. The implementation of a new ERP system may prove to be more difficult, costly or time-consuming than expected, and it is possible that the system will not yield the benefits we anticipate. ***Any disruptions, delays or deficiencies related to the new ERP system could materially impact our operations and adversely affect our ability to process orders, manage our inventory, fulfill obligations to customers or otherwise operate our business. In addition, implementation of a new ERP system will require significant resources, including the time and attention of our management and key crew members, in order to fully realize the anticipated benefits.***

(Emphasis added.)

20. The ERP system was designed to serve as an integrated platform for managing core business functions, including order processing, inventory management, fulfillment operations, and financial processes. The Company acknowledged that these functions were central to its ability to operate effectively, such that deficiencies in the ERP system could impair its ability

to process orders, manage inventory, fulfill customer obligations, and otherwise conduct its business.

21. Vital Farms positioned the ERP implementation as part of its effort to build a scalable and efficient operating model capable of supporting its rapid expansion. As the Company grew its distribution footprint and increased production capacity, it emphasized the need for improved systems and processes to maintain operational consistency and efficiency across its business. The ERP system was intended to provide the technological foundation necessary to manage that growth and align internal processes with increasing operational complexity.

22. The implementation of the ERP system was a resource-intensive undertaking, requiring significant financial investment as well as substantial involvement from management and key personnel. The Company disclosed that the transition required, and would continue to require, the "time and attention of [its] management and key crew members," reflecting the importance and complexity of the system within the organization.

23. In addition to its operational role, the ERP system was tied to the Company's efforts to strengthen its internal processes and control environment. The Company indicated that completion of the ERP transition contributed to enhancing its control environment, demonstrating that the system was not only operationally significant but also relevant to financial reporting and internal controls.

24. On February 27, 2025, Vital Farms filed its annual report on a Form 10-K for the fiscal year ended December 29, 2024 ("2024 10-K"). The 2024 10-K stated the following, in pertinent part, concerning Vital Farms' internal controls:

**Management's Annual Report on Internal Control over Financial Reporting**

* * *

Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, and under the oversight of our Board of Directors, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 29, 2024, based on the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation, ***our management, including our Chief Executive Officer and Chief Financial Officer, concluded that, as of December 29, 2024, our internal control over financial reporting was not effective because of the material weakness described below.***

* * *

Management identified that it did not effectively design, implement or operate certain process-level control activities related to the revenue process***. Specifically, there were ineffective controls to ensure the accuracy of the inputs (e.g., price and/or quantity) in the sales order entry and invoicing processes impacting revenue and accounts receivable.*** Management concluded that this material weakness resulted primarily from the Company's ineffective risk assessment related to the selection and development of appropriate control activities in the revenue process due to not having a sufficient number of trained resources with expertise in and responsibility for the design, implementation, operation, and documentation of internal control over financial reporting.

(Italicized emphasis added.)

25. The 2024 10-K also contained an identical risk disclosure as in the 2023 10-K regarding the implementation of Vital Farms' new ERP:

We are in the process of transitioning to a new enterprise resource planning, or ERP, system, in order to support our future growth and more fully optimize our existing processes. The implementation of a new ERP system may prove to be more difficult, costly or time-consuming than expected, and it is possible that the system will not yield the benefits we anticipate. ***Any disruptions, delays or deficiencies related to the new ERP system could materially impact our operations and adversely affect our ability to process orders, manage our inventory, fulfill obligations to customers or otherwise operate our business. In addition, implementation of a new ERP system will require significant resources, including the time and attention of our management and key crew members, in order to fully realize the anticipated benefits.***

(Emphasis added.)

26. The Company attributed this material weakness, in part, to deficiencies in its internal risk assessment and a lack of sufficient personnel with the requisite expertise to design, implement, and maintain effective control activities. These disclosures indicated that, as the Company continued to scale its operations, it lacked adequate internal infrastructure and trained resources necessary to support reliable financial and operational processes.

27. These control deficiencies were directly relevant to the Company's ongoing system implementation. The system was designed to serve as an integrated platform for managing core business functions, including order processing, invoicing, inventory management, and financial reporting. As such, the existence of a material weakness in these same processes underscores the importance and operational sensitivity of the implementation.

28. Also on February 27, 2025, Vital Farms held an earnings conference call for the fourth quarter and full fiscal year 2024. During the conference call, Defendant Diez-Canseco stated that Vital Farms' guidance for 2025 would be $740,000,000 in sales. Later during the earnings call, Defendant Wrede made a similar statement, stating, "we are expecting net revenue of at least $740,000,000" in fiscal year 2025.

**Materially False and Misleading**
**Statements Issued During the Class Period**

29. The Class Period starts on May 8, 2025, when Vital Farms filed its quarterly report on a Form 10-Q for the quarter ended March 30, 2025 of fiscal year 2025 ("1Q 2025 10-Q"). Attached to the 1Q 2025 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Diez-Canseco and Wrede attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

30. The 1Q 2025 10-Q stated the following, in relevant part, concerning Vital Farms' internal controls:

> ***As further detailed in Part II, Item 9A, "Controls and Procedures" of our latest Annual Report, in the process of assessing our internal control over financial reporting, management identified deficiencies in controls to ensure the accuracy of the inputs (e.g., price and/or quantity) related to the sales order entry and invoicing processes impacting revenue and accounts receivable that resulted in a material weakness.*** Management concluded that this material weakness was primarily due to ineffective risk assessment related to the selection and development of appropriate control activities in the revenue process due to not having a sufficient number of trained resources with expertise in and responsibility for the design, implementation, operation, and documentation of internal control over financial reporting. As a result of the material weakness identified, our management concluded that our internal control over financial reporting was not effective as of December 29, 2024.

(Emphasis added.)

31. Additionally, the 1Q 2025 10-Q contained an identical risk disclosure as in the 2024 10-K concerning the implementation of Vital Farms' new ERP:

> We are in the process of transitioning to a new enterprise resource planning, or ERP, system, in order to support our future growth and more fully optimize our existing processes. The implementation of a new ERP system may prove to be more difficult, costly or time-consuming than expected, and it is possible that the system will not yield the benefits we anticipate. ***Any disruptions, delays or deficiencies related to the new ERP system could materially impact our operations and adversely affect our ability to process orders, manage our inventory, fulfill obligations to customers or otherwise operate our business. In addition, implementation of a new ERP system will require significant resources, including the time and attention of our management and key crew members, in order to fully realize the anticipated benefits.***

(Emphasis added.)

32. Also on May 8, 2025, Vital Farms held an earnings conference call for the first quarter of fiscal year 2025. During the earnings call, Defendant Wrede stated the following concerning Vital Farms' implementation of its new ERP:

> Now to discuss our digital transformation initiative, which includes our new ERP system implementation. ***We've updated the launch date from summer to early fall***

> ***2025 to ensure flawless switchover. The timing adjustment supports our commitment to minimize any risk for operational disruptions*** and does not add cost to the budget for the project. ***We remain fully committed to this investment, which is fundamental to the operational improvements we are planning***, including streamlined processes, increased efficiency and an enhanced ability to compete and reinforce our position as an industry leader.

(Emphasis added.)

33. The statements in ¶¶ 30-32 were materially misleading at the time they were made. Defendants emphasized that ERP implementation was "fundamental to the operational improvements we are planning" and stated the implementation of the ERP would require the time and attention of "management and key crew members"; and Wrede stated that Vital Farms pushed back the expected implementation date of the ERP to "ensure flawless switchover." Given the stated importance of and management's knowledge of the issues surrounding the implementation of the ERP, Defendants knew, or were reckless in not knowing, that the Company delayed ERP implementation because of concerns about disruptions to the business, that pushing back implementation would not "ensure flawless switchover," and the ERP implementation would result in delays of shipments and/or production. Defendants did not warn investors that implementing the ERP would result in delays in shipments and/or production – instead merely couching that risk as a hypothetical in their risk disclosures – or that, as a result of those delays, Vital Farms would lose important retail shelf space, which would negatively impact its business and operations. Indeed, Defendants later stated on November 4 and December 3, 2025 that the disruptions the Company experienced implementing ERP were "expected" and "always part of our plan."

34. On August 7, 2025, Vital Farms filed its quarterly report on a Form 10-Q for the quarter ended June 29, 2025 ("2Q 2025 10-Q"). Attached to the 2Q 2025 10-Q were SOX certifications signed by Defendants Diez-Canseco and Wrede attesting to the accuracy of financial

reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

35. The 2Q 2025 10-Q stated the following, in relevant part, concerning the Company's internal controls:

> ***As further detailed in Part II, Item 9A, "Controls and Procedures" of our latest Annual Report, in the process of assessing our internal control over financial reporting, management identified deficiencies in controls to ensure the accuracy of the inputs (e.g., price and/or quantity) related to the sales order entry and invoicing processes impacting revenue and accounts receivable that resulted in a material weakness.*** Management concluded that this material weakness was primarily due to ineffective risk assessment related to the selection and development of appropriate control activities in the revenue process due to not having a sufficient number of trained resources with expertise in and responsibility for the design, implementation, operation, and documentation of internal control over financial reporting. As a result of the material weakness identified, our management concluded that our internal control over financial reporting was not effective as of December 29, 2024. As described in Part I, Item 4, "Controls and Procedures" in this Quarterly Report, we are implementing additional controls to remediate this material weakness. However, we cannot provide assurance that we will be able to do so in a timely manner, and such remediation efforts could require increased management time and attention and resources.
>
> (Emphasis added.)

36. The 2Q 2025 10-Q contained the following substantially similar risk disclosure regarding Vital Farms' ERP implementation:

> We are in the process of transitioning to a new enterprise resource planning, or ERP, system, in order to support our future growth and more fully optimize our existing processes. The implementation of a new ERP system may prove to be more difficult, costly or time-consuming than expected, and it is possible that the system will not yield the benefits we anticipate. ***Any disruptions, delays or deficiencies related to the new ERP system could materially impact our operations and adversely affect our ability to process orders, manage our inventory, fulfill obligations to customers or otherwise operate our business. In addition, implementation of a new ERP system has required and will continue to require significant resources, including the time and attention of our management and key crew members, in order to fully realize the anticipated benefits.***
>
> (Emphasis added.)

37. Also on August 7, 2025, Vital Farms held an earnings conference call for the second quarter of fiscal year 2025. During the conference call, Wrede stated the following:

> ***Our digital transformation [ERP] initiative remains on track and we continue to target early fall 2025 for the switchover.*** [. . .] Now looking ahead, given our strong performance in the second quarter, including successful implementation of our price increase, ***we are raising our full year 2025 guidance. We now expect net revenue of at least $770,000,000*** representing growth of at least 27% versus 2024, an increase from our previous guidance of at least $740,000,000.

(Emphasis added.)

38. The statements in ¶¶ 35-37 were false and/or misleading at the time they were made because: (1) as stated previously, the ERP implementation was important to Vital Farms' operations, and "management and key crew members" had been investing "significant" time and attention to this roll-out; (2) the ERP implementation was imminent; (3) as such, Defendants knew, or were reckless in not knowing, that the ERP implementation would result in delays in shipments and/or production; (4) Defendants did not warn investors that implementing the ERP would result in delays of shipments and/or production, instead merely couching it as a hypothetical in their risk disclosures; (5) indeed, rather than warn investors, Defendants hyped up the imminent roll-out of the ERP, ***increasing*** their 2025 guidance from $740,000,000 to ***$770,000,000***; and (6) as a result of the delay in shipments and/or production, Vital Farms would lose important retail shelf space, which would negatively impact Vital Farms' business and operations.

39. On November 4, 2025, Vital Farms filed its quarterly report on a Form 10-Q for the quarter ended September 28, 2025 ("3Q 2025 10-Q"). Defendants Diez-Canseco and Wrede signed SOX certifications attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

40. The 3Q 2025 10-Q stated the following concerning the Company's internal controls in pertinent part:

> ***As further detailed in Part II, Item 9A, "Controls and Procedures" of our latest Annual Report, in the process of assessing our internal control over financial reporting, management identified deficiencies in controls to ensure the accuracy of the inputs (e.g., price and/or quantity) related to the sales order entry and invoicing processes impacting revenue and accounts receivable that resulted in a material weakness.*** Management concluded that this material weakness was primarily due to ineffective risk assessment related to the selection and development of appropriate control activities in the revenue process due to not having a sufficient number of trained resources with expertise in and responsibility for the design, implementation, operation, and documentation of internal control over financial reporting.
>
> (Emphasis added.)

41. The 3Q 2025 10-Q contained the following risk disclosure regarding Vital Farms' implementation of its ERP:

> We recently completed a multi-year transition to a new ERP system to support our future growth and more fully optimize our existing processes. The ERP system implementation required, and is likely to continue to require, investment of significant financial resources and the time and attention of our management and key crew members. It is possible that the system will not yield the benefits we anticipate. ***Any disruptions, delays or deficiencies related to the new ERP system or the implementation thereof, or the design, integration or implementation of other technology systems we may choose to implement in the future, could materially impact our operations and adversely affect our ability to process orders, manage our inventory, fulfill obligations to customers or otherwise operate our business.***
>
> (Emphasis added.)

42. Also on November 4, 2025, Vital Farms held an earnings conference call for the third quarter of fiscal year 2025. During the conference call, Defendant Wrede stated:

> We continue to make good progress addressing the material weakness in our revenue recognition process identified in our 2024 annual report. Importantly, ***this was a design deficiency only with no impact on our financial statements, and we remain on track to complete remediation by year end subject to the ongoing enhancements of controls in the recently implemented ERP system.*** On to guidance.

> Given our strong performance in the third quarter, ***we are raising our full year 2025 net revenue guidance to at least $775,000,000*** representing growth of at least 28% versus 2024. I would like to point out that ***we did see a small amount of revenue pull forward into the third quarter from the fourth quarter ahead of our planned ERP go live date. We had announced the go live date to the trade so that they could plan ahead for it.***
>
> * * *
>
> Let me also touch a bit more on the ERP implementation. We turned on our new ERP system at the beginning of the fourth quarter on September 29. As planned, the new system is working very well. We put a great internal team in place at a realistic timeline with multiple test iterations and partnered with the right implementation vendor. As is common with any system implementation of this complexity, we are now in a planned hypercare period in the fourth quarter.
>
> During this hypercare period, we budgeted additional resources to support operations at ECS and address any issues as they arise. That said, given that ECS had to learn to operate using new processes and software tools, ***the ERP startup slowed down production for the first two weeks of the fourth quarter, but that was always part of our plan and therefore has had no impact on our guidance for the full year.*** However, you can see the impact in the most recent Canada data. Following this expected temporary slowdown, ***the business has quickly bounced back and we are now operating at pre go live shipment levels.***
>
> (Emphasis added.)

43. The statements in ¶¶ 40-42 were false and/or misleading at the time they were made because: (1) as stated previously, the ERP implementation was important to Vital Farms' operations, and "management and key crew members" had been investing "significant" time and attention to this roll-out; (2) by the time the 3Q 2025 10-Q was filed, the ERP was already implemented and caused "slowed down production"; (3) as such, even if the slowdown occurred in the first two weeks of the fourth quarter of 2025, the risk disclosure concerning the ERP implementation was deficient, as the delay was more than a hypothetical at this point; (4) Defendants, who had never before warned investors that production would slow down as a result of implementing the ERP, suddenly claimed that said slowdown was "always part of our plan";

(5) rather than admit the impact of the slowed production on Vital Farms' operations, Defendants misled investors by saying "the business has quickly bounced back and we are now operating at pre go live shipment levels"; (6) indeed, rather than warn investors of the impact of the slowed production, Defendants stated the slowdown "had no impact on our guidance for the full year" and even ***increased*** their 2025 guidance from $770,000,000 to ***at least $775,000,000***; and (7) as a result of the delay in shipments and/or production, Vital Farms would lose important retail shelf space, which would negatively impact Vital Farms' business and operations.

44. On December 3, 2025, Wrede and Diez-Canseco spoke at the Morgan Stanley 2025 Global Consumer and Retail Conference. Morgan Stanley analyst Megan Alexander asked Wrede "You raised your guide again on the third quarter call last -- about a month ago, implied an acceleration in volumes here in the fourth quarter. You talked about ERP transition would create some noise in the scanner data. But now that we're through most of November, at least from what folks can see in scanner data, can you just talk about has the volume performance you've seen in the scanner data been in line with your expectations as you think about what's implied in the 4Q guide?"

45. Wrede responded, stating "We started off the quarter with, as you said, Megan, with the ERP implementation that went remarkably well. We avoided the pitfall of so many ERP implementations that we couldn't ship for, pick a number of weeks. We did have a slowdown at ECS in our production. That was to be expected. Crew there had to learn a whole new way of processing the eggs, using new technology, using new systems. And that lasted about 2 weeks. By week 3, we were back at pre-ERP implementation production levels, by week 4, we were above pre-ERP implementation production levels."

46. The statements in ¶45 were materially false and misleading at the time they were made. First, ERP implementation did not go "remarkably well." Just thirteen days after these remarks, Defendants disclosed that the Company materially reduced its expected net revenue for fiscal year 2025 because of disruptions caused by the ERP transition in the fourth quarter. Second, Wrede's statement that the slowdown lasted two weeks, that the pre-ERP implementation production levels returned by the third week, and production levels exceeded pre-ERP implementation levels by week 4 materially misled investors about the extent of the problems caused by the ERP implementation. As Defendants acknowledged on December 16, 2025, "production was slow for the first few weeks after the ERP implementation" and "for 6 weeks, retail takeaway was below what you would consider the normal seasonal pattern."

**THE TRUTH BEGINS TO EMERGE**

47. On December 16, 2025, before markets opened, Vital Farms filed a Form 8-K attaching a press release entitled "Vital Farms Sets $2 Billion Net Revenue Target for 2030; To Host Investor Day in Springfield, Missouri." In a section titled "Update on Fiscal 2025 Outlook," the press release stated that "[f]or the full fiscal year 2025, management now expects Net Revenue of $755 to $765 million. This reflects a temporary disruption in returning to regular order patterns following the company's enterprise resource planning (ERP) system transition at the beginning of the fourth quarter of 2025."

48. The press release further stated that "Effective December 5, Vital Farms exited the 'hypercare' phase of its ERP transition project, marking the return to normal operations that leverage the new IT system and capabilities."

49. Later that day, the Company held an Investor Day analyst call. In his prepared remarks, Wrede stated "I know you have all seen in the press release that we put out this morning.

All the questions I got this morning already were about these new numbers. So I'm just going to address them upfront. We updated our net sales guidance for this year 2025 to a new range of $755 million to $765 million. It's a result of a longer-than-anticipated return to normal order patterns after our ERP implementation at the beginning of Q4."

50. Wrede continued, stating "we implemented our ERP system at the beginning of Q4, September 29. We continue to be damn proud of that implementation. We were the rare exception where we implemented an ERP system, and we didn't stop shipping because of it, but shipments were slow in the beginning. ECS had to learn a whole new process of producing eggs. And because of that, production was slow for the first few weeks after the ERP implementation. And so as a result, retail takeaway, this is retailer data or scanner data from Circana, as a result, for 6 weeks, retail takeaway was below what you would consider the normal seasonal pattern. Production actually was back to pre-ERP levels, the week of October 20. That's in the middle of this highlighted period here. It just took a little bit longer for retail consumption to pick up again, to go back to what we would consider as the normal seasonal pattern."

51. Analysts were surprised and disappointed by the reduced guidance. An analyst report from Benchmark Equity Research stated that "[t]he guide down for FY25 was a clear disappointment, with a guidance increase six weeks ago to $775M+ coming down to $755M-$765M" and that "the announcement was disappointing and believe it could have and should have been made weeks earlier []."

52. On this news, Vital Farms stock declined by $2.33 per share, or 6.7%, to close at $32.20 on heavy trading on December 16, 2025.

53. The press release also stated that "[m]anagement continues to expect Adjusted EBITDA of more than $115 million for the full fiscal year 2025, reflecting disciplined expense

management" and that "[m]anagement's initial outlook for 2026 Net Revenue is $930 to $950 million."[1] On the analyst call, Wrede reiterated that "[w]ith the guidance update this morning, we also reconfirmed our adjusted EBITDA guidance of $115 million as a minimum."

54. The statements in ¶53 were materially false and misleading at the time they were made. As the Company disclosed on February 26, 2026, Adjusted EBITDA for 2025 was $114 million – not the "$115 million as a minimum" that Defendants told investors just twelve days before the end of the 2025 fiscal year. Similarly, the Company's $930 to $950 million net revenue guidance for 2026 materially misled investors about the Company's ability to recover, as demonstrated by the Company materially reducing that guidance to $900 million to $920 million on February 26, 2026.

55. On February 26, 2026, before markets opened, Vital Farms filed an annual report on a Form 10-K for the fiscal year ended December 28, 2025 ("2025 10-K"). The 2025 10-K disclosed that the Company had an Adjusted EBITDA of $114.0 million for fiscal year 2025 despite telling investors that the Company "continues to expect Adjusted EBITDA of more than $115 million for the full fiscal year 2025" just twelve days before the end of the fiscal year.

56. The 2025 10-K reported that the Company's net revenue for fiscal year 2025 was $759,444,000, confirming that Vital Farms significantly missed the "at least $775,000,000"

---

[1] The Company states that "management believes that Adjusted EBITDA, a non-GAAP financial measure, provides investors with additional useful information in evaluating our performance. We calculate Adjusted EBITDA as net income, adjusted to exclude: Depreciation and amortization; Stock-based compensation expense; Benefit or provision for income taxes, as applicable; Interest expense; Interest income; and Amortization of cloud computing arrangements." Beginning in fiscal year 2025, the Company began including "amortization of cloud computing arrangements" in its Adjusted EBITDA, specifically amortizing its ERP transition costs in the fourth quarter of 2025.

revenue guidance the Company shared on November 4, 2025. Furthermore, the Company missed the earnings per share ("EPS") consensus, reporting EPS of $0.35 versus market consensus of $0.39.

57. The 2025 10-K also revealed the delay caused by the implementation of the ERP. The 2025 10-K stated, in pertinent part, "[I]n the fourth quarter of fiscal 2025, we experienced temporary disruptions in order and fulfillment levels following the launch date of the new ERP system."

58. The 2025 10-K also stated that the Company's management had concluded that the Company had remediated the material weakness in internal control over financial reporting as of December 28, 2025. In relevant part, the 2025 10-K stated that remediation was based, in part, on "strengthen[ing] our control environment through the completion of a multi-year transition to a new cloud-based enterprise resource planning system in fiscal year 2025."

59. Also on February 26, 2026, Vital Farms held an earnings conference call for the fourth quarter and full fiscal year 2025. During the conference call, Wrede stated:

> Even though we have already gained healthy volume share year to date, as Russell had mentioned earlier, ***volume growth so far is lagging our initial expectations***. After the previously discussed ***several weeks of slow shipments following our ERP implementation last year*** during the lead-up to the peak holiday period, ***we are still recapturing shelf space.***
>
> (Emphasis added.)

60. On the call, Wrede disclosed that the Company's net revenue guidance for fiscal year 2026 was now $900 million to $920 million – materially lower than the $930 to $950 million Defendants disclosed at the December 16, 2025 Investor Day.

61. Analysts reacted negatively to this news, lowering their price targets for the Company. A February 26, 2026 report by Benchmark Equity Research stated "**Credibility Needs**

**to be Regained** – It is difficult to overstate how divergent the FY26 outlook is relative to expectations, most recently laid out at the December Investor Day just two months ago." The Benchmark report further noted that "the return of shelf space temporarily lost amid the ERP transition still not back to normal." A Morgan Stanley analyst downgraded the Company from overweight to equal weight and reduced its price target from $45 to $24.

62. On this news, Vital Farms stock declined by $2.68 per share, or 10.8%, to close at $22.11 on February 26, 2026.

63. During the Class Period, as detailed herein, Defendants' false representations and omissions of material facts about the Company's business caused Vital Farms stock to trade at artificially inflated prices and deceived purchasers of the securities. As Defendants' fraud and the previously-concealed, material, adverse information was revealed to the market, the price of Vital Farms stock fell precipitously.

64. Defendants' false and misleading statements concealed material risks from the public. Through Defendants' and other public disclosures, the market became aware of these previously undisclosed risks and/or these risks materialized. As a result, the price of the Company's stock fell precipitously.

65. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIONAL FACTS SUPPORTIVE OF SCIENTER

66. The Individual Defendants were each highly motivated to hide the disruptions caused by ERP implementation because their bonuses were directly tied to the specific metrics about which they misled investors.

67. According to the Company's proxy statement for its 2026 annual meeting, Diez-Canseco and Wrede both received substantial bonuses tied to the Company's achievement of net revenue and Adjusted EBITDA targets. The bonuses paid out on a sliding scale depending on whether the Company under- or over-achieved its targets.

68. The proxy statement states that the Company set a net revenue target of $784.5 million and an Adjusted EBITDA target of $113.4 million for 2025. The Compensation Committee determined that the Individual Defendants achieved (i) 96.8% of the Net Revenue target, resulting in an 84% payout; and (ii) 100.6% of the Adjusted EBITDA target, resulting in a 103% payout.

69. Based on these determinations, Diez-Canseco received $697,500 in cash bonuses on top of his $750,000 salary. Wrede received $253,890 in cash bonuses on top of his $455,000 salary.

70. Additionally, the Company granted the Individual Defendants significant equity in the Company as part of the long-term equity incentive program based on achievement of the same metric targets used for cash bonuses.

71. The Individual Defendants also sold shares of the Company's stock while in possession of material non-public information. These sales were unusual and suspiciously timed.

72. Wrede sold 6,993 shares of Vital Farms stock during the Class Period: 1,200 shares on June 12, 2025; 1,200 shares on July 11, 2025; 1,200 shares on August 11, 2025; and 3,393 shares on August 14, 2025. These sales generated $301,214 in proceeds, which exceeded Wrede's salary for 2025. Wrede did not sell any shares of Vital Farms stock either before or after the Class Period.

73. Similarly, Diez-Canseco sold 104,944 shares of Vital Farms stock during the Class Period: 45,143 shares on May 12, 2025; 16,700 shares on August 12, 2025; 16,700 shares on September 10, 2025; 9,667 shares on October 8, 2025; and 16,734 shares on December 15, 2025. These sales generated $4,116,308 in proceeds, which greatly exceeded Diez-Canseco's salary for 2025. After unloading a significant portion of his holdings just one day before the first corrective disclosure, Diez-Canseco has not sold *any* additional Vital Farms shares to date.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

74. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired Vital Farms securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Vital Farms, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

75. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Vital Farms securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.

76. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

77. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

78. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Vital Farms;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused Vital Farms to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of Vital Farms securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

79. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

80. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Vital Farms shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;
- As a public issuer, Vital Farms filed periodic public reports;
- Vital Farms regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- Vital Farms securities were liquid and traded with moderate to heavy volume during the Class Period; and
- Vital Farms was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

81. Based on the foregoing, the market for Vital Farms securities promptly digested current information regarding Vital Farms from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

82. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

83. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

84. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

85. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

86. Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Vital Farms securities during the Class Period.

87. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Vital Farms were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of Vital Farms, their control over, and/or receipt and/or modification of Vital Farms's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Vital Farms, participated in the fraudulent scheme alleged herein.

88. The Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Vital Farms personnel to members of the investing public, including Plaintiffs and the Class.

89. As a result of the foregoing, the market price of Vital Farms securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Vital Farms securities during the Class Period in purchasing Vital Farms securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

90. Had Plaintiffs and the other members of the Class been aware that the market price of Vital Farms securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Vital Farms securities at the artificially inflated prices that they did, or at all.

91. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

92. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Vital Farms securities during the Class Period.

## COUNT II
## Violations of Section 20(a) of the Exchange Act
## Against the Individual Defendants

93. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94. During the Class Period, the Individual Defendants participated in the operation and management of Vital Farms, and conducted and participated, directly and indirectly, in the conduct of Vital Farms's business affairs. Because of their senior positions, they knew the adverse non-public information about Vital Farms's business practices.

95. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Vital Farms's financial condition and results of operations, and to correct promptly any public statements issued by Vital Farms which had become materially false or misleading.

96. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which Vital Farms disseminated in the marketplace during the Class Period concerning Vital Farms's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Vital Farms to engage in the wrongful acts complained of herein. The Individual Defendants were therefore "controlling persons" of Vital Farms within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Vital Farms securities.

97. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Vital Farms.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Class Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 25, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Daniel Tyre-Karp*
Daniel Tyre-Karp (pro hac vice)
Laurence Rosen (pro hac vice)
275 Madison Ave., 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: dtyrekarp@rosenlegal.com
lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

**CONDON TOBIN SLADEK SPARKS NERENBERG PLLC**

Stuart L. Cochran
8080 Park Ln Ste 700
Dallas, TX 75231
Telephone: (214) 265-3804
Email: scochran@condontobin.com

*Liaison Counsel for Plaintiff*